*1146 OPINION.
Sternhagen:
The petitioner, in September, 1919, sold 2,180 shares of stock in the Ford Motor Co. of Michigan for $29,308,857.90, an average price of $13,444.43 a share. The gain derived from this sale was subject to tax in accordance with the Revenue Act of 1918, which took effect February 25, 1919, and which provided in section 202 (a):
That for the purpose of ascertaining the gain derived or loss sustained from the sale or other disposition of property, real, personal, or mixed, the basis shall be—
(1) In the case of property acquired before March 1, 1913, the fair market price or value of such property as of that date; * * *
This stock was acquired by petitioner before March 1, 1913, for not more than $44,900, and it is stipulated that the cost was less than the fair market price or value on that date. Hence the cost is of no concern, cf. Goodrich v. Edwards, 255 U. S. 527. In order to determine the gain to be included in gross income under section 213 (a) so as to compute the tax under sections 210 and 211, it was necessary to determine in the first instance "the fair market price or value” on March 1, 1913, of the property sold.
When, in March, 1920, the petitioner filed his return for 1919, he showed thereon a gain computed upon the basis of a 1913 value of $9,489.34 a share as stated in the letter of former Commissioner Roper. This gave a basis of $20,686,761.20 for the 2,180 shares sold and a gain of $8,622,096.70.
Omitting for the present any intervening events, the respondent, in March, 1925, made two assessments against the petitioner aggregating $10,909,588.08, which were to some extent based upon a new computation of gain derived from such sale, taking a fair market *1147 price or value of said stock on March 1, 1913, of $2,634 a share. This value was later raised to $3,547.84 a share, the result of which is that instead of a gain of $8,622,096.70 as returned by petitioner, the respondent fixed a gain of $21,574,406.70, thus increasing petitioner’s income by $12,952,310 and bringing about an increased tax.
The petitioner contests this, not only because he insists that the true value of the stock on March 1, 1913, was at least $9,489.34 as stated by Commissioner Roper and as used by petitioner, but also because, as he argues, the respondent was without power to determine any other value, even if correct in fact, and was without power to make the 1925 assessments, and because under all the circumstances the United States has no valid demand for any tax arising from a change in valuation. He contends that respondent was by established law restrained from entertaining any question as to valuation, and hence that the United States was effectually precluded from collecting the additional tax even if the amount thereof was no more than could have been collected had timely demand been made.
These questions of the effect of the Roper valuation and of the respondent’s power are presented generally in each of these associated cases, and most of the facts and contentious are common to all petitioners. But there are also differences in the conduct of the individual petitioners and of the respondent as to each, and these must be recognized to the extent that they may affect the final disposition of each proceeding. For the function of the Board in these cases is not primarily to declare a rule, but to determine the issues presented in each case in the light of the evidence therein, to the end that the individual present tax liability of each petitioner may be settled.
We take up first for consideration whether the respondent had power to make the determinations of fair market price or value of the Ford stock on March 1, 1913. If, for any reason, he had no such power, his determinations of deficiencies, whether assessed or not, were pro tanto void — not merely incorrect, but utterly void; and irrespective of what they were or what factors of computation they embodied, it is unnecessary to adjudicate their soundness.
The petitioners contend that the so-called Roper valuation of $9,489.34 was official and authoritative and had the effect of a closed determination of fact; that it is binding upon the respondent and the Government by way of estoppel or necessary administrative practice; that, further, even if this be not so of the Roper valuation taken by itself when made, the subsequent actions in respect thereof by later Commissioners, prior to the respondent’s present assessments and notices, were such as to bind the respondent to its correctness; and as to the cases involving jeopardy assessments, it is said that such assessments are invalid for want of cognizable cir *1148 cumstances denoting the essential jeopardy and for want of bona Udes.
One of the arguments vigorously pressed in behalf of all the petitioners is that the doctrine of equitable estoppel (which it is contended may properly be invoked against the Government) interposes to prevent a change in the Roper valuation to their detriment. It is said that the conduct of each petitioner and Commissioner Roper contains all of the necessary elements of estoppel — that is to say, Commissioner Roper, as Commissioner of Internal Revenue, was advised that his valuation was necessary before petitioners would sell; that, being aware that it would influence petitioners’ conduct, Commissioner Roper in his official capacity made the valuation and communicated it to petitioners; that petitioners relied upon the valuation and acted in the light of it as they would not otherwise have acted, and that the change from such valuation would operate to' their detriment and hence would work an injustice. The nature of this argument is such as to omit any consideration of the measure of petitioners’ tax liability had timely demand been made, and strikes only at the respondent’s right at this time to assert such liability as might otherwise exist — an argument finding its basis, not in the express terms of the statute by which tax liability is commonly measured, but in the conduct of the parties. Such an argument must be treated with the utmost caution, since its sanction in any case would result in having individual tax liability depend, not upon the factors and measures prescribed by Congress as applicable to all, but upon the statements and conduct of a particular Government officer in respect of each individual.
While some of the facts in the argument of estoppel vary in the case of some of the several petitioners, all assert' two factors, viz., Commissioner Roper’s valuation and their reliance upon it in making the sale. It is clear that if Commissioner Roper’s valuation lacked force, it receives no greater sanction from the fact that petitioners relied upon it; and it also seems clear that if petitioners’ reliance is not legally cognizable, the argument of estoppel must fall. If Commissioner Roper’s valuation was not a binding valuation and petitioners therefore had no “right to rely on it,” their voluntary election to rely upon it and to continue to rely upon it does not make it binding.
That there was no obligation to rely on Commissioner Roper’s valuation is manifest. Petitioners as substantial stockholders in the Ford Company could have examined its books and records just as Talbert did and could have made whatever investigation of market value they deemed advisable to convince themselves of the true value of the stock. If their opinion of value differed from Commissioner Roper’s, they were nevertheless free to use their own *1149 valuation in their returns, and if they desired to protect themselves against any doubt of the accuracy of their figure, they were at liberty to take such measures in their sale contract, or otherwise, as would be most likely to afford them such protection. Of the several courses open to them, they chose to adopt Commissioner Roper’s valuation. In such circumstances, we are of opinion that their reliance upon the Roper valuation, whether in making the sale, making their returns, making charitable contributions, or submitting to State inheritance taxes, gives it no greater authority than it otherwise has.
It may be said that in the particular case of Senator Couzens there is no clear evidence that he actually relied upon the Roper valuation, and but slight evidence from which such reliance might be inferred. It appears that sometime before June 14, 1919, he learned somehow of the Fords’ desire to buy the stock and somehow saw Commissioner Roper’s letter to Ballantine; that on June 14, 1919, he gave an option to Edsel Ford, and that on September 2 he sold his stock. In giving his option and making his sale he might or might not have relied upon the Roper valuation, and for the purpose of working an estoppel more would be required than an assumption that he did.
There is vigorous dispute as to Commissioner Roper’s authority to make the valuation or to give it force, and counsel for petitioners, while insisting that the valuation was authorized, recognize that if it was not authorized much of their argument falls. Tho duties of the Commissioner of Internal Revenue are simply and broadly stated in section 321, Revised Statutes, 13 Stat. at Large 233, as follows:
The Commissioner of Internal Revenue under the direction of the Secretary of the Treasury shall have general superintendence of the assessment and collection of all duties and taxes now or hereafter imposed by any law providing internal revenue * * * .
This statute was enacted June 30, 1864, and has remained unchanged. There appears to have been no occasion for judicial construction and we have found no decisions of the courts interpreting it. The language itself is reasonably clear, and since it has served without any disturbing exposition-for more than sixty-three years, we should refrain now from affecting it unnecessarily. But broad as the language of section 321 is, it is difficult to see by what reasonable interpretation it can comprehend a duty to make an official appraisement of property before there is any certainty that there will be any assessment or collection of a tax to superintend, or indeed any certainty that there will be any transaction within the purview of a taxing statute. Such a duty, if it existed under this general statute, would be available equally to all, for it is not conceivable that any Commissioner would have the power to grant for some the request for an anticipatory appraisal and to refuse it to others. Nor *1150 would he have the power by his own fiat to exercise the duty for a time as a matter of policy and then to discontinue it.
By section 250 (b) of the Revenue Act of 1918 and the Revenue Act of 1921, and section 271 of the Revenue Act of 1924 and the Revenue Act of 1926, the Commissioner is required as soon as practicable after the return is filed to examine it and determine the correct tax. This more particular definition of his duty as to income tax clearly adds nothing to the authority derived from section 321, Revised Statutes.
The evidence shows that at the time of the valuation there was in the Bureau of Internal Revenue a policy of being helpful to taxpayers in adjusting them to the new tax law, but that this policy interfered with the administration of the assessment and collection of taxes and was soon restricted. Petitioners refer to this policy of helpfulness as giving force to the Roper valuation. We think it has no such effect. It should not be understood that the law forbids a helpful policy. There is a public interest in cooperation by the Bureau of Internal Revenue, and it should be given as freely as efficiency and good administration permit. But it can not go so far as to fix a responsibility beyond that contemplated by the statute, and it would be unjustified to stifle a spirit of helpfulness with a caution against binding and irrevocable action. So without passing upon the Commissioner’s right to be incidentally helpful to taxpayers and without reviewing his discretion as to its form or extent, we think that it adds no force to a particular act.
Petitioners .say, too, that the Commissioner’s act tended to promote a larger revenue and thus was in the line of his official duty and among his implied powers. Duty is all we need consider, for the latitude of his power may be wider than the boundaries of his duty. We can find no duty of the Commissioner to promote transactions from which revenues may be derived. He does not create revenues nor decide the sources from which they are to be derived, nor can he be expected officially to encourage or discourage one source as against another or to supervise activities of private citizens except to see that duties and taxes imposed are properly assessed and collected. The fact that he may have been willing to' do so ox that petitioners were willing to have him do so, does not bring the matter within the scope of his official duty and hence lends no sanction to his valuation.
Whether in fact Commissioner Roper intended to establish a definitive valuation or to be understood as binding or estopping the United States is far from clear. In Government dealing, words of liability should be carefully chosen. It seems to us unwarranted to import judicial finality into the statement that the Bureau, whose practice was recited as not to determine such questions in advance, “is disposed to regard $9,489.34 as a fair valuation of the stock on *1151 March 1, 1913, and one which should be used in computing any profits made from the sale.” This language was used in a letter to a lawyer acting for a trust company in connection with a matter involving large sums and, as stated, affecting an important industry. We can not escape the belief that if legal finality had been intended to be accomplished and assured by way of estoppel or judicial determination, words more positive and decisive would have been insisted upon and found.
It is unnecessary to discuss other considerations in the study of estoppel except to say that even if Commissioner Roper’s act were authoritative and the argument of reliance were available to petitioners, there would be other questions requiring examination: such as, whether there was such privity between Commissioner Roper and any of the petitioners as to make the valuation a representation to them; whether the valuation, based, as it was, solely on book figures, carried on its face by clear implication a reservation as to true “fair market price or value”; whether in fact the alleged reliance of any of the petitioners was on Commissioner Roper’s statement or on Webb’s assurance; whether mutuality of binding force is inherent in estoppel, and, if so, whether there was in petitioners a right to claim refund had the true value been better for them than Commissioner Roper’s figure.
It is our opinion therefore that, without looking into other considerations than those discussed, there is no estoppel in the present case in favor of any of the petitioners based upon the Roper valuation, because such valuation was neither authorized nor intended to be binding and there was no necessary or justifiable reliance thereon.
We are not called upon to determine whether in any case the doctrine of estoppel can shield the citizen against a demand by the United States for taxes. Petitioners cite many decisions to the effect that in various situations the Government may be estopped in a proper case. Whether there is an estoppel must always be answered in the particular, and must depend on a consideration of the circumstances; and there is no reason here to attempt to comprehend all situations in a general rule. But, however it may be in cases involving contract or other situations where the Government deals on an equality with its citizens, there is a necessity inherent in its sovereign power of taxation which the doctrine of estoppel can resist in only the most extraordinary case. Whether there may be such a case is not now within our power to know. If so, it must arise from circumstances more favorable to the taxpayer than those of the present petitioners.
The respondent conceives the petitioners’ argument to be founded in contract and upon this conception argues that no contract could arise because the Commissioner had no power to make such a contract *1152 expressly and that from his duties and authority none could be implied. The foregoing considerations as to estoppel seem to support this view, but since the petitioners expressly disclaim any reliance upon the principles of contract, we deem it unnecessary to consider or pass upon the argument.
There is, say petitioners, a rule applicable to all departments of the Government long recognized by the courts and arising from administrative necessity or expediency by which, irrespective of estoppel, the respondent Commissioner was constrained to treat the value arrived at by his predecessor as an established and unalterable fact. This rule, it is argued, requires that the Roper valuation should not have been disturbed by respondent and should not now be disturbed by the Board. The rule relied upon is said to be found in many decisions cited, and its application to the present cases is sought to be demonstrated by reasons of justice and convenience. The respondent denies the rule and that there is any reason to support it in tax cases generally and in these cases in particular.
Looking alone at Commissioner Roper’s valuation, it has already been stated that it was not required and was entirely gratuitous. Clearly, if Commissioner Williams, immediately upon receiving the return, had actively questioned the gain or had actively undertaken by hearing or otherwise to verify the value, the Roper valuation could not have been forced upon him. Nor could it have been forced upon petitioners. However persuasive it may have been because of the confidence in the men concerned with it and the reported extent of their investigation, it had no official status. Even if it be given weight as evidence, this is less than calling it such a judicial or quasi-judicial determination as an executive officer may sometimes make. It is of no avail that the actual scope of the investigation and valuation may have been exactly the same as if they had taken place under a duty. Its binding force depends upon the legal authority behind it. Anything which affects its weight has no place in the consideration of its inherent nature and force. We hold that the Roper valuation was a voluntary, gratuitous act outside the scope of the Commissioner’s official duty, and that it was not a judicial or quasi-judicial determination of fact and' had no force. Whatever may be the rule about reopening matters once determined, it has no application to Commissioner Roper’s statement, and his successors in office were free to consider the value de novo. And it follows that such subsequent consideration was not restricted or otherwise affected by the fact that Commissioner Roper had considered and stated a value, and that there was no presumption as to its correctness.
Petitioners say, further, that irrespective of the inherent force of Commissioner Roper’s valuation, it became official and bound all subsequent Commissioners when Commissioner Williams made the *1153 initial assessment after tbe returns were filed. Commissioner Williams came into office April 1, 1920, and tbe Couzens return, which had been filed in Detroit on March 15, together with payment of the first installment, arrived in Washington in ordinary course May 11, 1920. On June 8-, 1920, formal assessment was made of the amount shown on the face of the return. This assessment was the usual perfunctory act of the Commissioner and, clearly, it did not amount to an adoption or fixing of this value or any other item stated or implied in the return.
The contention is made, however, that Commissioner Williams established the value of 19,489.34 when the Deputy Commissioner, in the letter of February 8, 1921, after the Phillips audit, set forth the return “as corrected'’ and indicated no change in the Ford stock gain but only a change in the treatment of the dividend resulting from the Ford-Dodge decree of distribution. There is in our opinion no merit in the contention. The Phillips audit of 1920 was, as shown by the evidence, a “superficial” or “desk audit” as distinguished from an “intensive audit,” and was made so that revenue clearly due would be quickly made available. It did not purport to consider or adopt doubtful items but only to lay them aside for a time until in due course they could be given proper attention. As to the Ford stock value, Phillips saw Talbert’s valuation and let it stand for what it was worth without passing upon its correctness. There was no active determination of this item or of the correctness of the return as a whole. Petitioner recognized this and immediately sought a hearing as to the items proposed to be changed.
The only other circumstance during Commissioner Williams’ administration or that of Acting Commissioner West was that a field examiner made an investigation in Detroit as to petitioner’s liability for 1916,1917,1918, and 1919, and, although he considered the Talbert valuation, left it unchanged. There is no evidence of any consideration of his report by Commissioner Williams or Acting Commissioner West, or during their terms, and there is no basis for attributing to either of them an official approval of its contents. So far as this record shows, there was nothing done by Commissioner Williams or Acting Commissioner West in respect of this matter different from the usual conduct as to all taxpayers and their returns. If this conduct is to be given the force of an adjudication of every fact in the return which was not expressly modified, it must be by virtue of a standard applicable to all. Such a standard would be at variance with an experience well known since the adoption of the complicated war-tax acts, and its recognition now would imply that for the ten. most troublesome years of tax administration a ready means of settlement has been permitted to lie dormant and be ignored. We are *1154 unwilling to indulge such an assumption and we find nothing in the revenue acts to indicate that it was within the intendment of the revenue system. Nor do we find in the decisions of the courts anything compelling the view that the audit of a return by one Commissioner precludes a modification by a succeeding Commissioner of the facts upon which the computations were based.
It seems to us that in the nature of a function so complicated in performance, so comprehensive in its effect upon the whole people, and so undiscriminating in its burdens, there is a strong necessity for freedom of investigation. One Commissioner must take up the function as another leaves it, and the continuity of the office should be preserved so far as possible, irrespective of the incumbent. When Commissioner Blair took the office, the petitioner’s returns were under consideration for one reason or another, partly because the Bureau had found reason to demand further taxes and partly because petitioner had sought credits and abatements, and it would be an artificial rule which drew a line between items on each return which were open for his consideration, and those which were either entirely closed from consideration or were open only for the benefit of the taxpayer. As to Senator Couzens, there was pending at the time Commissioner Blair took office an investigation of the returns of all years back to 1916, and Commissioner Blair assumed authority and responsibility in respect thereof. It seems clear that in determining liability for all of these years he was not arbitrarily limited unless the rule as to such limitation was definitely known and quite impelling.
The petitioners cite many decisions from which they say the rule is derived. After considering all the cases cited and recognizing as we must that there are, in cases involving other executive departments, judicial expressions so general in scope as to seem to comprehend the situation before us, we have found no authoritative decision so closely applicable as to require the conclusion that Commissioner Blair could not treat the value as an open and unsettled question. Cases arising out of the necessity of quiet title under a Government contract or grant, or which are founded in long, continuous and positive acquiescence in an isolated fact, or in the doctrine that respect will be given by the courts to accepted executive construction of law, or that one executive office should accept the finding of another executive office, or involving a statute expressly committing the final decision of a fact to the executive officer, all seem to us to rest upon reasons not present here. Much of the doctrine, of the finality of executive action is born of the need to prevent unending doubt. It is prompted by the view that, if chaos is to be avoided, there must be an end of controversy and uncertainty so long as fraud is not involved, and recognizes that ordinarily the Government is not otherwise restricted by a statute of limitations. Congress has, however, in the *1155 revenue act, provided a system wbicb in the legislative judgment meets these needs and gives such assurance of certainty and termination as Congress deemed expedient. This system includes a statutory period of limitation, an opportunity for a written agreement binding both the taxpayer and the Government, and a definitive proceeding before the Board before payment can be required. Thus, we think that the matter has been so fully taken hold of by Congress that there is no room for a judicial standard like that recognized as to some other executive departments.
Of general interest upon this subject is Wickwire v. Reinecke, 275 U. S. 101, holding that a determination by the Commissioner that a transfer was made in contemplation of death was not conclusive and was open to attack. The rule in the Wickwire case was applied as to a finding of fact supporting an internal tax and is therefore germane here. How far, if at all, it affects the general rule heretofore recognized in respect of other executive departments, as illustrated by Bates & Guild Co. v. Payne, 194 U. S. 106; Silberschein v. United States, 266 U. S. 221, and others, is not a question within the province of our present consideration. The two decisions of the District Court in Penrose v. Skinner, 278 Fed. 284; 298 Fed. 335, in which the rule is considered, were rendered prior to the Wickwire decision and the obiter expressions therein seem to us to be inconsistent with the higher authority. The significance of the Wickwire decision may also be indicated by the citation therein of Fidelity & Columbia Trust Co. v. Lucas, 7 Fed. (2d) 146, in which the District Court expounded the view that the rule applicable to other departments is not embodied in the taxing system. See also Dallas Brass & Copper Co., 3 B. T. A. 856.
The next restriction upon the respondent is said to be found in his own official regulation. By Treasury Decision 3240, of October 31, 1921, and an office order of June 20, 1923, the Commissoner, it is said, was required to treat this case as closed and not available for further consideration. There are, it seems to us, several reasons against this view.
What was a “closed” case within the meaning of the orders was shown by the evidence to be an intra-Bureau question as to which the practice was in great confusion. The practical construction of its own order by the department charged with its administration being so ambiguous, there is no guide for one outside the Bureau to determine its meaning or intended effect. It seems to us that the Board should refrain from so interpreting an executive order as to include within it a situation not clearly covered by its terms either expressly or by usage within the department.
Again, it seems to be agreed that even a “closed” case could be reopened if gross error or “error in calculation” were discovered. *1156 This can only mean that the Commissioner may at any time entertain the idea of reopening, and may examine the case to determine whether such error has been committed. Whether there has been such error must in the first instance rest with him. This implies the very power which petitioners contest, namely, the power to disturb a finding already assumed to be correct. The question whether the error was such as to justify the inquiry deals not with the power to reopen but with the wisdom of reopening and the correctness of the determination. But even if this Board is to judge after the event whether there was in fact such evidence of error as to justify reopening, we can not say that there was not. A calculation which appears to the executive officer to be based upon an incorrect formula and which appears to him to deprive the Government of an amount of tax strikingly large and which would move a reasonable man to immediate inquiry, seems to the Board to be sufficient to justify him in reopening a case. At least the Board can not say there was not sufficient evidence of error to move' the Commissioner to inquire. Whether in fact the calculation turned out to be error, and if so to what extent, are questions which depend on the evidence and do not touch the present question of the respondent’s power.
Lastly, as to the effect of the departmental orders, we are of opinion that they may not go so far as either to impose upon a taxpayer more than his statutory tax or to relieve him from its full burden. Congress, as we have said, has prescribed a system for closing cases by limitation, agreement, or legal proceeding, and this must be held to be all comprehensive. It does not admit the view that the Commissioner may by regulation or ruling in a particular case close it from further consideration. We have seen from the Wiclewire decision that his ruling does not foreclose the taxpayer, and it is but reasonable to hold the door open as well to the United States.
It is said further that as to Senator Couzens the Commissioner’s statement in 1923, after conferences, to the effect that the eases "had been closed” as set forth in his previous letter, and the petitioner’s payment in October, 1923, amounted to such a closing agreement as was contemplated by the revenue acts. The Revenue Act of 1918 contains no provision for a closing agreement. The Revenue Act of 1921, section 1312, the Revenue Act of 1924, section 1006, and the Revenue Act of 1926, section 1006, provide for an agreement in writing between the taxpayer and the Commissioner with the approval of the Secretary that a determination shall be final. Petitioner made no such agreement clearly in terms, but up to the last has “saved his rights” to protest or litigate certain items of the adjustment which went against him. It is a strained construction of these statutory provisions, which applies them to the conduct of the parties as to *1157 certain items, holding them to be settled, and yet saves petitioner’s right to contest certain other items. In our opinion, these sections of the statute provide for a clear and unequivocal agreement as prescribed therein, manifesting the intention finally to dispose of all controversy as to the years in question, and nothing less can by construction be held to take its place. And after careful consideration we are constrained to this view notwithstanding the decision of the learned Court of Claims in Botany Worsted Mills v. United States, 63 Ct. Cls. 405 (now pending on certiorari in the Supreme Court of the United States).
The petitioner contends also that the assessment made by the respondent in March, 1925, and which gave rise to this proceeding was void because it purported to be a jeopardy assessment when in truth the statutory conditions for such an assessment did not exist. The assessments as to Senator Couzens were made on March 11 and 13, 1925, and the five-year period of limitation for assessment would have expired two days later on March 15, 1925. Acting solely on the belief that because of the imminent bar of the statute of limitations the assessment and collection of the tax was jeopardized by delay, Commissioner Blair, by his authorized assistant, made the assessment by virtue of section 274 (d), Revenue Act of 1924. That section is as follows:
If the Commissioner believes that the assessment or collection of a deficiency will be jeopardized by delay such deficiency shall be assessed immediately and notice and demand shall be made by the collector for the payment thereof. In' such case the assessment may be made (1) without giving the notice provided in subdivision (a) of this section, or (2) before the expiration of the 60-day period provided in subdivision (a) of this section even though such notice has been given, or (3) at any time prior to the final decision by the Board upon such deficiency even though the taxpayer has filed an appeal. If the taxpayer does not file a claim in abatement as provided in section 279 the deficiency so assessed (or, if the claim so filed covers only a part of the deficiency, then the amount not covered by the claim) shall be paid upon notice and demand from the collector.
The petitioners contend in effect that the Board may entertain the issue as to whether the Commissioner’s belief of jeopardy was well founded, and that when it appears that the only foundation for such belief is the fact that the statutory limitation period is about to expire the Board must hold that this is not sufficient and hence that the assessment is unauthorized and void. Furthermore, it is contended that since the evidence discloses by the testimony of the respondent Commissioner himself that when he made the assessment he was in doubt about the value of the stock, and discloses further that there was no new evidence of value which had not been known within the Bureau for several years, it must be held that the alleged deficiency was not bona fide determined but was arbitrary, unwarranted, capricious, and an abuse of discretion, and hence no ground *1158 of assessment. It is feelingly urged that such a situation can be called a determination in form only and lacks the substance to entitle it to respect, and it is said to place an intolerable burden on taxpayers that they should be required to contest it in litigation before the Board and give bond pendente lite, and that an unnecessary burden is placed upon the Board that it should be required to redetermine it.
The jeopardy assessment thus being void, it is said that there can be no deficiency, since the procedure under section 274 (a), providing for an ordinary notice of deficiency, has lapsed. The effect of such a reading of the statute is that when the Commissioner determines that a deficiency exists and at the same time believes that delay will jeopardize its collection, his election to assess is at the peril of losing the tax entirely, for even if the deficiency be clear, it would be lost if the belief of jeopardy proved to be mistaken. Such a construction demonstrates with increased force the wisdom of the rule stated in California Associated Raisin Co., 1 B. T. A. 1251, that the Board is without power to adjudicate whether the circumstances upon which the Commissioner acted were such as to denote jeopardy and justify his belief. We adhere to that decision.
But since it may still be doubtful, notwithstanding our own view, whether the Board is required to review the evidence to determine whether in fact “the assessment or collection of a deficiency [would have been] jeopardized by delay,” we have examined the question. Our conclusion is that, since the expiration of the period limited by the statute does indubitably destroy the right of assessment and collection, its imminence within a time too short for the normal operations of the Bureau of Internal Itevenue is a fact which may reasonably cause the Commissioner to believe that assessment and collection will be jeopardized by delay and justify him in making an assessment. We find no occasion to construe section 274 (d) as excluding such a situation from its ambit.
Nor do we think that the legal validity of the determination or assessment is to be measured by the intent, motive, or method of reasoning of the respondent. It is only the official exercise of power manifested in the form prescribed by the law that this Board is to review, and since the taxpayer has full opportunity to have this judged by the standards of the statute, it would be improper to judge it by the depth of respondent’s personal conviction. This Board is not sitting in judgment upon the person who holds the office of Commissioner of Internal Itevenue, but only to redetermine the correctness of alleged deficiencies. We must assume without inquiry the bona fides of the determination and that it represents the Commissioner’s official judgment of a deficiency. There is nothing in the *1159 statute which indicates that the Board’s function should go beyond this.
We are therefore of opinion that the respondent had full power and authority to make such determination of deficiency as he did, and that he was not precluded from so doing by reason of the prior action of any Commissioner, including himself, and that the determination of deficiency was valid, subject only to redetermination by this Board. We refrain entirely from considering or expressing any view upon the several suggestions made as to the moral aspects of the matter or the criticisms urged as to the wisdom or ethics of the respondent’s conduct, since we regard such considerations as not within the domain of our official judgment.
Since the respondent’s determination and assessment were authorized, it is within the jurisdiction of the Board to redetermine the deficiencies, and we proceed now to consider the merits of the opposing contentions in respect of the fair market price or value of the stock of petitioners in the Ford Motor Co. on March 1, 1913.
Questions as to the burden of proving the value, the presumptions as to correctness of one or the other of the several figures used by the Government, or other dialectic considerations, have been fully discussed in other decisions heretofore rendered by the Board and need not be here considered. The merits of the substantive question of valuation have been pleaded and evidence pro and con has been introduced by all parties at great length. With the task before us of weighing this evidence, we have not regarded it as essential to discuss in detail the place given to well-known standards of judicial consideration.
The respondent has, however, presented a view which can not go unnoticed, for it seems to us to be at variance with the long-existing system of tax administration and contrary to the intention of Congress as to the function of the Board. The determination of questions related to tax liability is now, as for a long time it has been, in the first instance to be made by the Commissioner of Internal Revenue. There is no indication anywhere in the statute that that officer has been relieved of this duty. On .the contrary, the statute clearly contemplates that before notifying a taxpayer of a deficiency and hence before the Board can be concerned, a determination must be made by the Commissioner. This must mean a thoughtful and considered determination that the United States is lawfully entitled to an amount not yet paid. If the notice of deficiency were other than the expression of a bona fide official determination, and were, say, a mere formal demand for an arbitrary amount as to which there were substantial doubt, the Board might easily become merely an expensive tribunal to determine moot .questions and a burden might be *1160 imposed upon taxpayers of litigating issues and disproving- allegations for which there had never been any substantial foundation.
In this case, the respondent has testified that when he made the jeopardy assessments he “was not clear in his own mind that any tax was due.” The figure used as the basis for computing the gain upon which the jeopardy assessment was based was almost the lowest of all those mentioned during the controversy. The jeopardy assessment was partially abated on the basis of a higher figure. Some of respondent’s evidence was directed toward a still higher figure. In their brief, respondent’s counsel say:
The members of this Board are themselves, by experience, experts in valuing securities and in deciding the questions of judgment involved in translating undisputed facts into terms of value. * * *
The Government is in the position of contending for no specific value and for no specific method of valuation; its sole contention is that the value of $9,489.34 on the basis of which taxes have already been paid, is grossly excessive.
This, in our opinion, discloses a misapprehension. The Board and its members do not have, and are not expected to have, peculiarly expert knowledge upon the value of securities or any other of the multitudinous questions of fact which arise in the vast number of cases before it. It can only decide the issues in any case by giving judicial consideration to the evidence properly in the record. Such evidence is not to be regarded, as expressed by respondent’s counsel, as an “assistance” to the Board in discharging a duty imposed upon it, but as the proof and substantiation by the parties of the positions which they respectively present for adjudication. The function of the Board should not be confused with that of the Commissioner of Internal Revenue. The Commissioner’s determinations are in aid of his administrative duty to see that taxes imposed are assessed and collected, and there are no methods prescribed for the ascertainment of the facts upon which such administrative determination must be based. The Board is outside this organization with a duty to hear and decide as between the taxpayer and the Commissioner upon a record publicly made in accordance with rules of evidence and procedure and subject only to appellate review by the courts of appeal. Aside from general matters well recognized as subject to judicial notice, it has in any proceeding no official knowledge except as gathered from the evidence therein, and its decision must reflect the preponderance of such evidence. To the extent that presumptions are considered, it is not because the Board chooses to employ them but because they are established in the law. We approach the problem of value, therefore, not as experts with the aid of the parties, but to judge impartially of the issue between conflicting interests, in the light of all the evidence.
*1161 Throughout the course of the tpíal, an objection was interposed repeatedly by counsel for petitioners to evidence tending to recognize that there might be a difference in valuation of a share of stock when grouped with a minority interest, ^from that of a share grouped with the raajority^In support of the objection, it is urged that to value a share of stock differently for tax purposes when of the minority than when of the majority is to make an unconstitutional classification. The objection was consistently overruled.
Tt seems cle--” to us that what the .B'oard is called upon to do in f he presen' "«W ■ s no t to asses.-; an ad valomnrbax upon property but to redetermine i-U. gain derived imm the sale of specific, identified property -2,180 shares of stock We must determine the issue as to the fair market price or value on March 1, 1913, of the very property soA'd. This value may or.it may not, as a matter of fact, be arrived ah by finding a 'proportionate value of its 2,180 component items, and we find nothing whicE'roquires us as a matter of law thus to compute it. If, as we must bo ready to consider, it should appear by competent evidence that a block of ten shares were worth more them ten times' one separate share, the law would not close its eyes > ■_ jhat-tei: u. There may be, in the quantity, advantages which would aoluady affect value, -and proof on the subject is at least as good as the multiplication table, and must be weighed with all the other evidence. While reason does not ¡¡.emit that a block of stock would be worth more wheiTbought from A than when bought from B, it is altogether possible that such a block wmuui command a mgher yet fair price if it represented the balance of power or control over the corporate business. Whether it does or not requires evidence to determine, and in our opinion so long as the problem is to determine true value such evidence is admissible for whatever weight it may have.
In any case such as this, requiring the determination under the income-tax laws of value of property on March 1, 1913, the problem of valuation is approached with little or no restriction arising from the purpose of the litigation. It,is, for example unlike a proceeding to determine the value in respect of which an interstate carrier or local utilitj7' is to have its rates regulated, the theory of valuation in such a case being considered in the fight of its effect upon the more important ulterior problem of public rate regulation. Under section 202 of the revenue laws, the value to be ascertained is, in terms, absolute, the onty purpose being to measure the tax by the gain above the value on March 1, 1913 (where higher than prior cost), Goodrich v. Edwards, 255 U. S. 527; Walsh v. Brewster, 255 U. S. 536; and see United States v. Flannery, 268 U. S. 98, which value the taxpayer is entitled to treat as capital reserved from tax. Lynch v. Turrish, 247 U. S. 221; Southern Pacific v. Lowe, 247 U. S. 330; Lynch v. *1162 Hornby, 247 U. S. 339. The riiethod of valuation is in itself unimportant, so long as it gives due regard to all the facts and relevant evidence, and results in a value which has a reasonable relation thereto. There may be no slavish adherence to a formula, Minnesota Rate Case, 230 U. S. 352; Georgia Ry. Co. v. R. R. Comm , 262 U. S. 625, and whether the method should proceed from a definite study of, say, original, cost, see Donaldson Iron Co., 9 B. T. A. 1081, or cost of reproduction new less depreciation, see Paducah Water Co., 5 B. T. A. 1067, and compare Rockford Malleable Iron Works, 2 B. T. A. 817, or from gnaeraippmipns-of qualified witnesses, or from book value, or from recognized m'arket quotations o.r other data, must depend upon the nature of the property under consideration and the extent to which such evidence bears a relation^ to its value. Moreover, since it is the stock', we are considering ''¡and not the corporation’s tangible or intangible assets^-^e are mot directly concerned with a method, like, for instance, that set forth in A. R. M. 34, 2 C. B. (1920) 31, for arriving at the value of good will or other intangibles separately from the tangible or other assets, or a napthod for classifying or segregating the constituent parts whi^h are reflected in the value of the stock representing the whole. ' — —__ _ ;■...
In the foregoing findings we have set forth all the significant facts which in our opinion can be fairly as^rtained from the evidence. The evidence has all been considered and weighed. Obviously it is impractical to assign to any fact a precise weight or to define its relative emphasis or importance:-'The most that can be done is to indicate generally the extent of our consideration in arriving at a conclusion.
It has been said that value is the price at which a willing seller and a willing buyer would agree to trade if they both were aware of the facts. As to a completed transaction, this is a simple statement. But there is a great difference between finding value from an actual transaction and finding it by assuming from the circumstances a hypothetical transaction from which value is to be inferred. Here the problem is to determine as of a past date the fair market price or value of property the like of which was not involved at that time in any transaction, and as to which there was no willing seller or willing buyer and no direct evidence of the considerations which would actually have moved them to buy or sell such property. We have sought to place ourselves on March 1,1913, — recognizing all the facts in existence or in contemplation on that date as shown by the evidence, and from them attempting reasonably to predict those to come, being neither unduly skeptical nor unduly optimistic, we have sought to determine what an intelligent and reasonable seller and aji intelligent and reasonable buyer would in their fairly mercenary interests have been most likely willingly to agree upon as a price for the property *1163 in question. Clearly opinions might differ as to such price. .A common figure must be agreed up.on.
This stock was not listed nor dealt in on any stock exchange and it can not be known how its value would have been affected if it had been. Numerous witnesses whose opinions were given as to the value made it apparent that they were to some extent applying to the problem the considerations applicable to a freely marketable listed stock. Such opinions are weakened to that extent. On March 1, 1913, no attempt had been made to list the stock on an exchange and, if an application had been made to the New York Stock Exchange, it would not have been listed because of its restricting provisions. For this reason the problem of valuation is kept free of the elusive factors which bring about the variations in daily stock quotations. The stock was all held by persons whose interest in it was identified with their interest in the Ford Company. There is no suggestion in the evidence that up to that time they regarded it as anything but an investment in the automobile manufacturing business of the corporation, uninfluenced by the chances of stock market rise or fall. Since it had not been offered or bid for on an open market, was not listed for trading and was not avail-able for listing, and there was no prospect that it would be in the future, it is of little interest to speculate upon its price if it had been so marketed. So far as the- evidence indicates, a transaction in respect of this stock would, in 1913, have been governed largely by the situation of the corporation. This might not have been so with a listed stock, for it sometimes happens that such a stock is traded in wjthin a range of prices having but little perceptible relation to the commercial or financial standing of the corporation represented. The explanation for this is happily not necessary to be sought in this cas¿, but it is sufficient to realize that the valuation of such listed stocks is a problem which may involve substantially different considerations from the valuation of unlisted stock held by a small group of persons.
The respondent has referred to the provisions of the stock appearing on each certificate restricting its* sale to a stranger at any agreed price until existing stockholders were given an opportunity to buy it at the same price. This, it is urged, restricted the market and hence must be regarded as tending to depress the value. The testimony of dealers in stocks as to this was conflicting as between those who believed such a restriction would necessitate a lower price than if it were not present and those who believed that the value would be unaffected. In our opinion the latter view is entitled to greater weight. • The provision on the certificate does not prohibit sale nor limit price, but purports to give priority of purchase to certain persons, then stockholders, at the best price obtainable. If the stock have any value, whatever the owner is entirely free to sell it at his *1164 own price or hold it. If stockholders decline to buy at his price and others will, he may sell to the latter. He may shop around for a price, and his only constraint is that he must give stockholders the first opportunity to buy at his price. His stock seems to us to be worth no less, irrespective of who may have the right to be first in line to buy it at the highest price bid.
It is said that the provision involves a cumbrous and inconvenient method of disposing of the stock, and that this takes from its value. This reasoning confuses two propositions — the value of the stock and the method of realizing it by sale. If the apparent value of the stock and the price offered by an outsider were so slight as to be not worth the trouble of going through the prescribed method in order to sell it, it might well be that the owner would demand more or refuse to sell, just as the buyer would offer less or refuse to buy. It seems to us wholly impossible to appraise such a situation in terms of money value. Our problem requires the assumption of a fair and willing seller and a fair and willing buyer under all the circumstances. The stock provision does not prevent a transaction between such persons and it is the value arrived at in a free and open transaction between them which must be determined. This can not be checkmated by a statement at the outset that the stock is not readily marketable. We do not construe a fair market as meaning that the whole world must be a potential buyer, but only that there are sufficient available persons able to buy to assure a fair and reasonable price in the light of the circumstances affecting value.
That the stock was on March 1, 1913, very valuable is clear and is not denied. Throughout the trial the evidence on both sides was given in terms of superlatives. Although in our findings of fact we have attempted to strip these from the narrative, leaving only enough to indicate truly the reputation and good will of the company in so far as they affect value of the stock, there still remains from the naked facts an inescapable realization that here was a story of fortune that could be told only by adding rhetoric to statistics. The lowest value suggested is $2,055.79 a share, and opinions have varied upward to more than $13,000 a share. These differences are the result of wide disagreements as to the relative importance to be attached to the facts.
Nothing could better reveal the lack of a recognized standard for ascertaining value than this record. Opinions were as freely sought from and given by witnesses who could only give a categorical answer to the ultimate question of value with no supporting reasons for their opinions as those who had by a meticulous analysis assigned a relative weight or significance to each fact or assumption and arrived by mathematical processes at' a figure of value. These witnesses included executive heads of automobile manufacturing corporations, *1165 accountants, engineers, economists, statisticians, bankers, brokers, and teachers. This testimony was all treated by counsel as expert testimony. The opinions were received in evidence in the light of the qualifications which the examinations of the witnesses disclosed. The conflict of opinion however and the diversity of reasoning by which such opinions were arrived at indicate that the problem of valuation of the common stock of a closely owned manufacturing corporation has not yet been developed so far that any particular method of reasoning in respect of it is authoritative or any particular class of persons may be recognized as experts. There is likewise no method of arriving at such value which, so far as our research and the briefs of counsel show, has been established in the law as controlling. The facts and circumstances must be fully known in each case together with any available evidence of their interrelation and importance, and from this in its entirety the independent judgment of the Board must be derived.
Serious objection was urged by respondent to the admission in evidence of data as to events which occurred after March 1, 1913. It was urged that such facts were necessarily unknown on that date and hence could not be considered. It was apparent that there was a fear that the Board would in reaching its judgment be influenced toward a higher value if it were permitted to see the evidence of increasing value after the date in question. The evidence was nevertheless admitted. It is true that value on March 1, 1913, is not to be judged by subsequent events. There is, however, substantial importance in the reasonable expectations entertained on that date. Subsequent events may serve to establish both that the expectations were entertained and also that such expectations were reasonable and intelligent. Our -consideration of them has been confined to this purpose. Such subsequent events as have no reasonable relation to the considerations of the date in question have been disregarded. We have not, by looking at the subsequent events now knovrn, found what the value would have been had they been definitely known on March 1, 1913. The only facts upon which our judgment of value has been predicated are those reasonably known on that date. These included not only those which had completely occurred, but also those which were in process and those which were reasonably in contemplation.
The respondent’s argument for the exclusion of subsequent facts is curious in its inconsistency with the method actually adopted by the Bureau in arriving at the value upon which the jeopardy assessments were predicated. This method as set forth in Finding ¶133 was to ascertain the mathematical relation between the actual sale price in ID 19 ($266,400,000) and the average annual income of 1916, 1917, and 1918 ($43,400,000) and then to apply this ratio to the average *1166 income prior to 1913 ($8,602,000), tbe resulting figure ($52,680,000) being the value of all the stock for March 1, 1913, or $2,634 a share. This figure was raised later by respondent by a different method, but that he still clings to the same idea is clear from the brief, where the following appears as an “analysis and comparison showing that' the Roper valuation is grossly excessive”:
The value of $9,489.34 per share, or a total value of $189,786,800, reflects a value of $167,113,239.67 in excess of the net tangible assets of the company as of March 1, 1913. That is, a value equal to 8.38 times the net tangible assets. As shown by the sale in July, 1919, the company was worth its tangible assets of $225,000,000 plus $30,000,000 in intangibles, or 1.13 times the net tangibles. Again, the value as shown by the 1919 sale was 4.4 times the earnings for the year preceding the sale, while the claimed value of approximately $190,000,000 is 11.2 times the earnings for the twelve months preceding March 1, 1913. Thus, if the 1919 sale be used as a proper basis of comparison it is manifest that the valuation of $9,489.34 per share as of March 1, 1913, is indefensible.
Similar computations are also presented taking as a basis the figure in the Humphrey negotiation of 1916.
If negotiations and sales taking place three and six years after are demonstrative of value, as respondent contends, there can be no force in the general contention that subsequent events are se irrelevant and hence inadmissible. But we have deemed it wiser in this case to admit the evidence and deliberate xipon its true significance than to treat the question as one of admissibility involving a hasty judgment during trial.
The most striking and outstanding impression, derived from the evidence as to value is that all the facts and circumstances point upward and are in favor of a high price rather than a low price. The history of the business from the beginning showed steadily and greatly increasing success. There is in this record no evidence of a mistake in policy or management which had substantially impaired the company’s efficiency or retarded its growing earnings. In the ten years of its existence, during which its policies were governed and its operations were conducted and managed by the same men, it had consistently planned, developed and adhered to a single method of doing business the wisdom of which they had never had cause to doubt. The only variation in the otherwise uniform history is the experimentation with and temporary production of several models in the early days before Model T was adopted in 1908 as the single product. From that time there was a deliberate and persistent adherence to a policy of uniformly manufacturing Model T cars in as groat quantities as practicable, with the utmost efficiency and the minimum cost, and selling them in increasing numbers by reducing the price. There was nothing haphazard in the company’s experience. The success was the outcome of reasoned judgment, faith of its managers in the souml *1167 ness of its policy, and courage and pertinacity to carry it through and reject all others.
By 1913 there was no occasion for trepidation. The risk was not in the automobile industry, for that was then established and recognized, nor was it in this particular company, for that also was on the highroad to great fortune. Apparently only a catastrophe could obstruct its progress, and no one has suggested what sort of catastrophe might then reasonably be feared.
The Government stresses as “the greatest risk of the Ford Motor Co.” the vagaries of Henry Ford and the chance of his sudden death. These were, of course, risks which would be considered by a reasonable seller and buyer. The difficulty is in measuring them. There is nothing in the record to suggest the view that in 1913 Henry' Ford had been unfavorably disposed toward the business or had done anything detrimental to its advancement, and there was no reason to infer that he ever would. If, as is suggested, he was eccentric or had the proverbial unreliability of a genius, there are no illustrations of these characteristics in this record prior to March 1, 1913, and nothing to indicate that they were latent. Nor is there any reason in the record to fear his untimely death or, if it occurred, that it would threaten the future of the business. He dominated the company and controlled its policies. But these had been fixed and the channel of the company’s progress still lay in the same direction as it had originally. The remainder of the management were not stupid or helpless, they knew the policies and were heartily in accord with all of them, and it is not reasonable to suppose that they would not carry along ideas and methods that had already proven so highly profitable and were still filled with rich prospect. Whether they could have done it as well or as profitably without Ford as with him is doubtful and this doubt presents a risk which must be considered.
Tue remaining risks observed by the Government are those faced by all business and rest in the uncertainties inherent in the future. Whether there was danger in the policy of confining the business to a single model instead of diversifying the output could depend only upon the intelligence and care with which appraisal had been made of the field of demand, the company’s ability to supply it, and the practicability and likelihood of competition. The evidence indicates that by March 1, 1913, research and experiment had established a growing demand in the largest class of possible buyers, i. e., those of small and moderate incomes, and experience had shown that Model T was satisfactory, that a change in style was then beyond the horizon, that the company was fitted to supply the market rapidly enough to keep the demand active, and that the obstacles confronting any *1168 competitor were such as to give the company a clear field for a long time to come. In such circumstances, an owner or a prospective buyer of the stock who knew the facts would not in our opinion say that there was great risk because the company, had departed from the more conventional policy of diversification of product.
It'is said there was risk to a minority stockholder that the earnings might not be distributed in dividends, and this proceeds from the observation that many of the dividends which had theretofore been declared were special, as distinguished from regular, and hence there was no established dividend policy to rely upon. But to a stockholder who receives regular and frequent distributions of a substantial portion of his corporation’s earnings and profits there is hardly enough importance in knowing whether they are regular or special dividends to affect the risk of his investment. From the facts it appears that the company had each year distributed the following percentages of its net earnings: 1908, 51 per cent; 1909, 57 per cent; 1910, 48 per cent; 1911, 40 per cent; 1912, 27 per cent; 1913, 42 per cent, and, as will be seen from Facts ¶268, the amount left in the business had been earning considerably over 100 per cent. From this it could be seen that there was neither an unreasonable withholding of profits by the directors nor a prodigal distribution in disregard of the future welfare of the company or the stockholders. The genesis of the suit of the Dodge brothers in 1916 to compel a further distribution does not appear as early as 1913. The reducing-price policy was not a means of diverting profits from stockholders to customers but was, so far as appears, used only to expand sales and increase profits. We can find no warrant for an apprehension on March 1, 1913, that the dividend policy would be inimical to a stockholder.
Giving to the risks adverted to by the Government the full measure of weight to which we think them entitled by the evidence, they serve to bring down the value only to the figure we have determined. .
A circumstance urged as adversely affecting value is the relative condition of the world, the country, and the market for money and securities on March 1, 1913. It is not entirely clear whether these conditions were thought to affect all commerce and finance, including the affairs of the Ford Company, or more directly the price of stocks on the New York Stock Exchange. The Balkan war, the uncertain political situation in Mexico, the sale in the United States of foreign-owned securities, and the election of Woodrow Wilson are all referred to in connection with an alleged decline in stock exchange prices. From a graphic chart (Exhibit U5) it appears however that on March 1, 1913, the downward movement of twenty industrial common stocks had started in the late summer of 1912 and having reached a point no lower than approximately it had reached sometime in each of the years since 1907, it was already beginning to swerve. It carries no *1169 indication on that date of a trend, upward, downward, or straightaway. It does not appear what effect these conditions would have upon the Ford stock, or why its value should be seriously affected. Aside from the view which we have expressed that the valuation of listed stocks is not an adequate criterion here, we include these circumstances among those imponderables which serve to fix the value at the figure herein determined.
Looking backward from March 1, 1913, over the entire history of the business, it appears that there had been a consistent and expanding development. The 'condition of the business on that date had evolved systematically. It can not be looked upon as transitory or one of the high spots of a sporadic career. It was but a day in an enterprise which had steadily grown and which might reasonably be expected to continue to grow. It is in this light that the data must be regarded, and not as if they were isolated from the life of the enterprise. Thus regarded, the history of the company is a forerunner of the future and not merely the explanation of the present. It enables us to say that the value of this stock is to be measured not only by the accounts of the day but also by the prospects of the morrow. And these prospects were entirely favorable.
The evidence shows that by March 1, 1913, the automobile industry as a whole was an established industry which, although it had progressed rapidly, was reasonably sure of an important and increasing place in commerce. Production by all manufacturers had grown from 65,000 cars in 1908 to 378,000 in 1912. Imports dropped from 1,624 cars in 1909 to 963 in 1912, and exports increased steadily from 2,477 in 1908 to 21,757 in 1912, with a correlative shifting of imports and exports of parts. The official bulletins of the Bureau of the Census indicate how definitely the automobile industry was established. See also the opinion of the Circuit Court of Appeals in Columbia Motor Car Co. v. Duerr, 184 Fed. 893, 895. Clearly it had passed the incipient stage and in 1913 its only uncertainty was the breadth of its future expansion.
In this industry the Ford Company had already taken its place as a loader. From 1909 to 1912, inclusive, the proportion of its sales to total production of all manufacturers increased from 10 per cent to 22 per cent, and in 1913 was to be almost 40 per cent. In the field of low-priced cars it was practically alone, and this was the most stable field of demand with the widest market and the greatest assurance of profits. Hence whatever prosperity was in store for the automobile industry was to be shared in great measure by this company, and when an examination is being made into the particular data of the Ford Company, it is necessary to bear in mind the favorable relation which the company bore to an expanding industry.
*1170 The evidence throughout the proceeding indicates what would otherwise seem reasonably clear, that the primary data from which value of this stock should be judged are those relating to the corporation’s earnings, and especially those affecting the extent of earnings which might reasonably be expected in the future. All other data are apparently probative only in so far as they help to measure future earnings. Standing alone, the entire past history of the company means nothing as to money value except as it has become embodied in convertible assets at the date in question. To liquidate a business or its assets requires no knowledge of its history. But in a case such as this, the historical facts are considered because the prospects must be gauged; and they are relevant only in so far as they illumine the future. There is nothing dogmatic about it. The conventional statistical studies covering five years preceding the date in question have no sanction per se, but only if, sensibly considered, they provide some index of wealth to come. So the trend of past events and statistics is important in a business such as this because it helps to indicate whether the business is expanding, and, if so, how rapidly.
The rapid advance of this company’s business is indicated by the statistical tables set forth in the findings. Production, employees, orders, sales, inventories and net tangibles increased, roughly, twofold each year after mass production of Model T began in 1908. Net earnings for the calendar year increased from $1,168,953.55 in 1908 to $14,119,989.87 in 1912, with no let-up in sight. To take an average of these five years as a forerunner of the annual achievements to come would obviously be unsound, for it would conceal the progress of the period. The business was advancing so rapidly that, measured by achievement, five years in its history was equal to a much longer period in many another enterprise, and 1908 had already become a remote year of its infancy. In our opinion, therefore, the principal significance of looking backward as far as 1908 is that it shows the rate of the more recent growth and thus gives some indication of' the probable future growth.
Since it appears clearly from the evidence that the earnings are entirely consistent with all the other data, earnings may fairly be looked upon as reflecting the financial progress and condition of the business. They are a financial compendium of the several factors which otherwise indicate the trend. The purpose of a business such as this is to make profit, and its stock should be appraised with reference to this. Primarily, the earnings are the test of success of the past and the indication of the future. The other statistics — of production, sales, &c. — and the description of the management and its methods and plans, serve to give depth and perspective to the earnings. Such other facts help to indicate the safety with which the earnings may be relied upon as-indicating a normal or healthy con *1171 dition. They are significant not of their own weight or force but only in their relation to earnings.
Expanding production and sales, the constant presence of orders waiting to be filled, a quick inventory turnover, might conceivably, each standing alone, be of little or no advantage. But when they are shown to be in the hands of good managers and have been part of a process which has resulted in large and expanding profits they are important. This is likewise true of the tangible assets. In a growing business, the purpose of which at the time under consideration is to make profits rather than to liquidate or to .preserve the property, the actual value of the tangible property is relatively unimportant. No one would relate the value of the stock to the tangibles, where earnings each year are considerably in excess of the entire value of the tangibles, notwithstanding depreciation, replacements and additions. In a case where the return on the investment were smaller so that the value of the tangibles would to some extent measure the security of the investment, such value would have a more prominent place.
The net earnings adjusted to calendar years prior to 1913 were:
1906_ $175, 615. 24 1910_$4, 145, 901. 74
1907_ 1, 001, 767. 44 1911_ 7, 541, 493. 01
1908_ 1, 168, 953. 55 1912_ 14, 119, 989. 87
1909_ 3, 176, 007. 18
They had increased more than twelvefold in the last five years. The last year’s earnings of $14,000,000 were almost twice those of $7,500,000 for the preceding year and over thrice those of $4,000,000 for 1910. For the fiscal years ending September 30 (Facts ¶265), the ratio of advance is substantially similar. January, 1913, produced net earnings of $2,249,685.70, the largest of any month in the company’s history, over five times as large as the preceding January of 1912 and almost ten times those of January, 1911. Feb. ruary, 1913, with $1,723,210.47, was three times February, 1912, and over four times February, 1911.
The experience of the company indicated that the earnings of every year had been more than eight times the earnings of January and February combined, so if this experience were to be taken as giving a normal ratio, the entire year 1913 would yield over $30,000,000.
The price of the car had been reduced and the year 1913 had begun with more unfilled orders on hand (24,765) than at any previous time February began with 6,690 unfilled orders and ended with 20,275. All of the activities of the company had been accelerated to accomplish more than it ever had before. The new buildings W and X were about ready for construction and plans were afoot for producing 200,000 cars in the year, instead of 75,000 which had been planned for 1912, 80,957 which had been manufactured in that year, and *1172 78,611 which had been sold. Assembly plants had been tried and found advantageous and extensive plans were made to establish them at new places. Everything was going ahead at an increasing rate, and so far as appears no one looked ahead to any less achievement than that of the past. On March 1, 1913, profits were being earned at the rate of $24,000,000 and we are of opinion that the expected annual net earnings would be no less than $25,000,000 for many years to come.
The period of the company’s success during which such earnings could bo expected could not be measured by any evidence in existence on that date. There was no limit that could be seen. The demand was increasing, and the field of possible purchasers was very large. There was no comparable substitute and no competitor was nearby. In such circumstances, it is extremely difficult to fix a period of earning power. The extent of the company’s plans and investment for the future indicate that the managers looked forward to a long period of prosperity, and we are of opinion that ten years or longer could be regarded as a period of earnings at the rate of approximately $25,000,000 a year.
This means that, since all the stock was common and involved an equal distribution of interest, the earning prospect was at the rate of $1,250 a share. In the past, the directors had indicated a dividend policy involving a reasonable distribution and a reasonable addition to surplus which had been compounding at strikingly high rates.
Looking at this in the light of all the circumstances and considering not only the bright factors but also the uncertainties and the risks which were inevitable, we are of opinion that the fair market price or value of the stock owned by this petitioner in the Ford Motor Co. on March 1, 1913, was at the rate of $10,000 a share.
While we have not arrived at this value by the application of any mathematical formula, because we believe that there is no authoritative formula available, we have given careful consideration to the several methods suggested in the course of the trial, and have not been unmindful of the aid to be derived from the use of such tests. The comparative studies which have been submitted of the Ford Company and numerous other industrial corporations, from which the market value of the Ford stock has been deduced were in some instances found to be of little help because they involved assumptions or collateral matters which were not cognizable here, or were based on unsubstantiated hypotheses, or fpr other reasons were found of little weight. We think it would unjustifiably deflect this opinion from its proper course to set forth a critical analysis of all of the evidence and methods by which the numerous witnesses arrived at their various opinions as to value.
*1173 There is also an inquiry which naturally arises as to why, since the stock was worth $10,000 a share in 1913, the petitioners were willing to sell in 1919 for $12,500, $13,000, or $13,444 a share. This, too, is not within the scope of this proceeding. Seemingly the stockholders in 1919 sold for less than what a careful study would have shown to be the full value of their stock. The only two of the petitioners who testified, John W. Anderson and Horace H. Rackham, indicated that there were considerations of sentiment which moved them to accept the offer without weighing the values too carefully. The Los Angeles interview may have caused some to feel that new dangers had developed. But whatever that situation was, it does not affect the inferences to be drawn from the circumstances of March 1, 1913.
The fair market price or value on March 1, 1913, of the petitioner's 2,180 shares of stock was $21,800,000. This is the basis prescribed by section 202 (a) of the Revenue Act of 1918 for ascertaining the gain upon the sale in 1919 for $29,308,857.90, and the gain is $7,508,857.90. From the facts it appears that the jeopardy assessments of March, 1925, aggregating $10,909,588.08 were attributable to the respondent’s change in the computation of this gain. Of this assessed amount of $10,909,588.08 respondent has already abated $1,454,284.98, and it is clear that in accordance with our decision the remaining $9,455,303.10 should also be abated. Whatever additional results for 1919 are derived from the decision in accordance with the Revenue Act of 1926 will require a further detailed computation.
Reviewed by the Board.

Judgment will be entered under Bule 50.

Smith, Morris, AruNdell, and MilliKEN did not participate in the consideration or decision of this proceeding.