**John W. JUNGBLUTH, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

No. 63–C–87.

United States District Court
E. D. Wisconsin.

Feb. 15, 1966.

Harry Primakow, Milwaukee, Wis., for plaintiff.

Donald Anderson and Daniel Dinan, Tax Division, Dept. of Justice, Washington, D. C., for defendant.

TEHAN, Chief Judge.

Plaintiff, John W. Jungbluth, brings this action to recover an alleged overpayment of gift taxes in the amount of $8957.36, on gifts of stock of the R T & E Corporation, a Wisconsin corporation. These gifts consisted of 200 shares of common stock of the R T & E Corporation on May 15, 1958 to his son, Harold J. Jungbluth, and a like gift of 200 shares to his daughter-in-law, Marion L. Jungbluth, wife of said Harold J. Jungbluth.

On January 2, 1959, the plaintiff filed a gift tax return wherein he reported the aforesaid gifts and paid a gift tax thereon of $45.00. The tax was computed by using a value of $35.00 per share. On June 20, 1961, the plaintiff received a notice of assessment in the amount of $7920.00, together with interest in the sum of $1037.36. The additional assessment was computed by the District Director of Internal Revenue on the basis of a value of $190.00 per share. Plaintiff has paid the additional assessment and has timely filed a claim for refund.

The sole issue before the court is whether the plaintiff has sustained his burden of proving that the Commissioner erred in placing a value of $190.00 per share, and if so, a determination from the evidence of the fair market value of the shares in question on May 15, 1958.

On the trial of this action, the plaintiff relied principally on the testimony of two expert witnesses, Dr. Erwin E. Nemmers and Dr. Oscar R. Goodman. The Government rested its case after the introduction of certain documentary evidence without producing any witnesses. It contends that the plaintiff has failed to sustain its burden of proof and argues that the evidence of record sustains the Commissioner's valuation of $190.00 per share.

R T & E Corporation is a Wisconsin corporation engaged in the manufacture and sale of electric distribution transformers for use by electric power companies. At the date of the gift, May 15, 1958, its stock was closely held and not traded on the open market.[1] At that date there were 14,500 shares of no par common stock outstanding owned by approximately 86 shareholders.

The predecessor of the corporation was the Rural Transformer & Equipment Company, organized in 1947 as an Illinois corporation. The corporate name was changed to R T & E Company in 1952, and the state of incorporation was changed to Wisconsin in 1955 when the

1. Prior to the year 1957, the only transactions involving the shares occurred in (1) 1950 when dissenting stockholders sold 2200 shares to the company at $15.00 per share, (2) March 1, 1955, 15 shares were sold at $24.00, (3) June, 1955, when there was an exchange of preferred for common stock at $33.00 per share, and (4) June of 1956, the widow of one of the founding stockholders sold 120 shares at $48.00 per share.

present name, R T & E Corporation was adopted. (Hereinafter called R T & E) The corporation has concentrated its activities on the development, production and sale of distribution transformers. It was the first new manufacturer to enter the distribution transformer field in a substantial way since the 1920's.[2]

Since its inception in 1947 and until the year 1953, R T & E's sales served mainly the rural electric cooperatives which draw their financing from the Rural Electrification Administration. However, after the "saturation of the large scale rural line building program" in 1952 to 1953, the company diversified its business to include the small maintenance accounts as well as the municipal and private utilities.[3]

The company's sales and profit record shows a steady and sometimes dramatic growth for every year since its inception except for the years 1952 and 1953, which show a sales decline due to the saturation of the rural line building program above referred to. The sales and earnings record for the five years preceding the date of the gift is as follows: (Plaintiff's Ex. 2)

"Earnings Record (all figures in thousands)

YEAR ENDED MARCH 31

|  | 1954 | 1955 | 1956 | 1957 | 1958 |
|---|---|---|---|---|---|
| **Income:** | | | | | |
| Net Sales | $1,645 | $2,148 | $2,665 | $3,672 | $4,333 |
| Miscellaneous | — | — | — | 15 | 6 |
| Total | 1,645 | 2,148 | 2,665 | 3,687 | 4,339 |
| **Costs and Expenses** | | | | | |
| Cost of goods sold | 1,178 | 1,417 | 1,725 | 2,328 | 2,511 |
| Engineering expense | 53 | 55 | 50 | 63 | 83 |
| Selling expense | 256 | 307 | 388 | 496 | 690 |
| General expense | 97 | 109 | 147 | 200 | 302 |
| Profit-sharing contribution | 4 | 12 | 16 | 27 | 33 |
| **Interest expense:** | | | | | |
| Long term | — | 1 | 4 | 8 | 19 |
| Other | 9 | 5 | 7 | 14 | 5 |
| Loss on Equipment sale | — | 15 | 1 | — | — |
| Total | 1,597 | 1,921 | 2,338 | 3,136 | 3,643 |
| **Earnings before income taxes** | 48 | 227 | 327 | 551 | 696 |
| Federal income tax | 18 | 106 | 156 | 260 | 341 |
| State income tax | 2 | 15 | 20 | 35 | 44 |
| Carry back credit on excess profits taxes | 7 | — | — | — | — |
| Net Earnings | 35 | 106 | 151 | 256 | 311 " |

2. Prospectus Loewi & Co., Inc., Ex. 31—October 9, 1958.

3. 1956 Annual Stockholders Report—R T & E Corporation, p. 11.

Thus, for the five years preceding the date of gift, sales for the year 1954 (ending March 31, 1955) were 30% above 1953, sales for 1955 (ending March 31, 1956) were 24% above the previous year, sales for 1956 (year ending March 31, 1957) were 38% above 1955, and sales for the year 1957 (year ending March 31, 1958) were 18% above 1956, an average growth for the four years of 28%.

In the Annual Report to Stockholders, published in March of 1957, the corporation announced the ambitious goal of reaching an annual sales volume of $20 million by 1967 as follows: (Defendant's Ex. 16)

"As we look into the future we see an even brighter picture. The industry as a whole will more than double in the next 10 years and if we just hold our own we too will double in size. However, we have more than this in mind. Our industry consists of 23 manufacturers of whom approximately fifteen operate on a national basis and are our true competitors. Recently Electrical World Magazine made a nation wide survey on customers preference of transformers and R T & E came out in seventh position. Now this is a great step forward from the last survey made wherein R T & E was not even mentioned. This new rating is an endorsement of our growth and position in the industry.

We currently do about 2% of the total national business in distribution transformers and aspire to 5% of the total within 10 years which would bring us to fifth position in the industry with an annual sales volume of $20 million by 1967. Actually this is an increase of 18% per year which is considerably less than 30% per year average of the last three years. This is a very ambitious program to engage upon but it is our conviction that it can be attained."

From the beginning R T & E had financed its growth principally by retained earnings which necessitated a low dividend policy. Prior to the year 1954 except for a dividend of 75 cents per share in 1949, the company paid no dividends on its common stock. In 1955, it paid $1.50, in 1956 it paid a regular dividend of $2.00 per share, and an "extra" dividend of $2.00 (total $4.00) and in 1957 it likewise paid a regular dividend of $2.00 per share, and an "extra" of $2.00.

In addition to financing through retained earnings, the corporation depended on financing through long term and short term loans.

In order to continue its growth pattern and reach its projected goal of $20,000,000 in sales by 1967, it became evident to the officers of the corporation that additional capital would be required. Therefore, at the annual stockholders' meeting in May of 1957, the President, Mr. Nelson, reported that in order to attain the stated goal, it would be necessary to raise approximately $200,000 through the sale of stock, with the additional amount necesssary obtained through long term financing.[4] Dr. Nemmers then explained the method of calculating the value of stock and stated that it was his opinion that ten times the corporation's average earnings of the past three years, amounting to $130.00 per share, would be an equitable value for the stock. It was then decided by the Board of Directors at the meeting the same day to conduct a poll of the shareholders to see how much of the issue would be purchased by the existing stockholders under their preemptive rights. The letter sent to the shareholders on May 21, 1957, stated that:

"This price [$130.00] is based upon an offer by a recognized underwriter to pay approximately this price for the entire amount we are considering issuing." * * *. (Deft.'s Ex. 20)

The offering of 1630 1/2 new shares at $130.00 per share was immediately oversubscribed by the existing stockholders. Dr. Nemmers, himself, who was entitled to 49 preemptive shares indicates his de-

---

4. On March 1, 1957 the company was able to obtain a ten year $350,000 loan from the Wisconsin Investment Fund payable in installments of $6250.00 with a final payment of $100,000 due on March 1, 1967.

sire to buy additional shares if all the shareholders failed to exercise their pre-emptive rights. However, because of similar requests by other sharesholders after the initial offering, Dr. Nemmers was able to purchase only 74½ additional shares which he did on July 1, 1957.

The ensuing fiscal year from March 31, 1957 to March 31, 1958, was another successful year of growth for R T & E in which sales increased from $3,672,252 to $4,332,438 and earnings after taxes per share increased from $17.65 to $21.43 (1957 Annual Stockholders' Report). Its 7.17% profit per sales was higher than the industry average of 3.2%.

Following the annual stockholders' meeting of May 18, 1957, the directors of R T & E at meetings on September 9, 1957, October 14, 1957, December 4, 1957, January 20, 1958 and February 24, 1958 considered the desirability of embarking on a stock marketing program. A respectable private consulting firm, Duff, Anderson & Clark, was engaged by the corporation to make an impartial survey to determine a fair market value for the stock. The report, dated February 18, 1958, was distributed to members of the Board of Directors for their study on February 24, 1958, and included an opinion based on comparative data that "the present market would value the earnings of R T & E for fiscal 1957 and previously at a rate which would have established a value of $140 per share at March 31, 1957." (Pltf.'s Ex. 12—p. 13) Thereafter on March 5, 1958, Loewi & Co., Inc., a recognized underwriter offered to buy not less than 20,000 nor more than 30,000 shares of common stock at $12.00 per share (Deft.'s Ex. 13) "providing that the corporation recapitalize" * * "splitting the present 14,500 outstanding no-par shares of stock on the basis of 15 shares for one * * *." This amounts to a pre-split price of $180.00 per share. This offer was conditioned upon acceptance by the proposed selling stockholders by March 14, 1958 and was never consummated.

On March 24, 1958, prior to the date of the gift, the Board of Directors at a Special Meeting unanimously adopted a resolution approving an amendment to the R T & E Corporate Articles, splitting the common stock twenty shares for one. (Deft's Ex. 25)

On May 17, 1958, two days after the date of the gift herein, the stockholders at their annual meeting approved an amendment to the Articles of Incorporation authorizing said stock split. Also, on May 17, 1958, the company sold 380 shares of the new common stock to certain key employees for $10.00 a share. Under a related agreement an additional "bonus" of 380 shares was placed in trust for said employees to be given to them when and if they remained in the company's employ for five years. (Deft.'s Ex. 31—p. 12) This price, then, represents a value of $200.00 on a pre-split basis or $100.00 per share if the "bonus" shares are considered as part of the purchase price.

On July 21, 1958, a little over two months after the date of the gift, the Board of Directors declared a dividend payable in cash or common stock at the rate of $10.00 per share. A total of 2,682 shares of stock were issued under this option.

On October 9, 1958, only five months after the critical date, May 15, 1958, a stock marketing program was consummated and the stock was publicly offered through the underwriters firm of Loewi & Company. Approximately 40,000 shares, which is equivalent to 2000 pre-split shares were immediately sold out at a price of $15.00 per share (or $300.00 on a pre-split basis).

Dr. Nemmers, one of the plaintiff's expert witnesses, prepared the prospectus accompanying the stock offering (Deft.'s Ex. 31) which described the business condition of the corporation, and as will be noted hereinafter, contained certain statements at variance with the opinions expressed by Dr. Nemmers at the trial.

## TESTIMONY OF PLAINTIFF'S EXPERTS

Dr. Erwin E. Nemmers is a professor of business administration in the Graduate School of Business at Northwestern

University. He is also, and has been since March of 1947, general counsel and economic advisor for R T & E. At the trial, he testified both as a witness having personal knowledge of the affairs of the corporation and as an expert in the valuation of stocks. Dr. Nemmers testified that in evaluting the market value of the 400 shares he was guided by a consideration of the factors listed in Revenue Rule 59–60, 26 C.F.R. 20,—20–31–22. "The valuation of the stock of closely held corporations where market quotations are either lacking or too scarce to be recognized." He stated categorically, as did Dr. Goodman, the plaintiff's second expert, that the preemptive stock offering of May, 1957, by the corporation as well as the offer of Loewi & Company in March of 1958 (which amounted to a price of $180.00 per pre-split share) were of no probative value in determining the market value of the gift of 400 shares of stock on May 15, 1958. This court cannot agree. The fact that the preemptive offer of May, 1957 was promptly subscribed, that Dr. Nemmers himself exercised his preemptive rights, and that the letter to shareholders referred to the price as based on an "offer of a recognized underwriting firm to pay approximately this price [$130.00] for the entire amount we are considering issuing" would be matters that would be studied with considerable interest by a prospective buyer. The $130.00 price is also consistent with the corporation's sales and profit figure at that date and the very bright prospects of the company for future growth. Also, the court believes that the offer of Loewi & Company in March of 1958 of $180.00 on a pre-split basis is a fact that an informed buyer on May 15, 1958 would consider in arriving at a price he would be willing to pay.

Dr. Nemmers cited a number of factors which he believed would have a dampening effect on the price of R T & E as of the date of gift, May 15, 1958. As to some of these factors, the pessimistic conclusions drawn by Dr. Nemmers on trial are at variance with his actions or statements at the time. Other asserted "dampening" factors are uncorroborated by any documentary evidence. Thus, Dr. Nemmers concludes that because in 1958 R T & E was in default on its long term loan agreement and had a debt in excess of 50% of its net worth on May 15, 1958, the company had its "back to the wall" and was in a risky financial situation. The fact is that in none of the minutes of the Board of Directors or Stockholders' Meetings is there any indication that this was a cause for concern. Neither Dr. Nemmers nor any officers ever raised any question about the allegedly dangerous condition at any Board of Directors' Meeting. The Wisconsin Investment Fund waived the default and as a matter of fact on June 1, 1958, actually increased its loan commitment to the corporation. Dr. Nemmers also made much of the fact that with the shrinkage of the Rural Electrified Cooperative Market, sales prospects for the corporation were bleak because R T & E in May, 1958, sold only to that market. Yet in the Prospectus of October, 1958, Dr. Nemmers himself wrote that

"The Corporation's markets for its distribution transformers are diversified. It sells distribution transformers to privately owned utilities, municipally owned utilities, rural electric cooperatives, and public utility districts." (Deft.'s Ex. 31)

Similarly, his emphasis on the "thinness of management" at the trial, echoed by Dr. Goodman, the other expert who admittedly obtained his "facts" from Dr. Nemmers is nowhere corroborated in the record, and is at variance with the Duff, Anderson, Clark report of February, 1958.

Dr. Nemmers' gratuitous assertions that the outlook of the distribution transformer industry was not good because of the indictment for anti-trust violations for almost all of the companies in the industry is unconvincing. Since R T & E was one of the few unindicted corporations, the court is inclined to believe that, rather than a depressing factor, this would be a distinctly encouraging one.

Both experts testified that the general economic outlook in May of 1958 was

bad as evidenced by the decline or "collapse" [5] of the stock market and that the same was true for the distribution transformer industry since the market had peaked in 1956 and declined thereafter. Although in theory this might have relevance to the value of R T & E stock, in actuality, the corporation's sales were increasing and it was making heavy inroads into the distribution transformer market. The Prospectus of October, 1958, prepared by Dr. Nemmers, already referred to, cited the threefold increase in consumption of electric power in the United States and a corresponding increase in total expenditures by electric power companies for distribution equipment.

Other factors which Dr. Nemmers claims had a dampening effect on the market value of R T & E as of May 15, 1958, was the history of dissension in the year 1950 resulting in the lodging of control of R T & E in four individuals as a voting trust. Absent any explanation or evidence of how said control was exercised to obstruct the management of R T & E, this court is unable to assess any degree of relevance to the issue of the valuation of the shares of the corporation on May 15, 1958.

Finally, in arriving at a valuation of $50.00 per share, Dr. Nemmers used the comparative appraisal method. He selected as his comparative, however, only one company in the electrical transformer business, the Moloney Electric Company, and arrived at a comparative value on three different bases, (1) Book value. In 1958, Moloney stock sold on the market at an average price of 42.8% of its book value for the year 1958. A correlation of this percentage to R T & E results in a value of $37.14.

(2) On a dividends basis. According to Dr. Nemmers, Moloney's yield for the year 1957 was 4.92%. Correlating that percentage to the $2.00 regular dividend of R T & E, results in a value of $40.65.

Dr. Nemmers refused to consider the "extra" dividend of $2.00 in making his comparison.

(3) On a price earnings basis. Dr. Nemmers testified that the price earnings ratio of Moloney is 3.9%. Dr. Nemmers does not disclose that the 3.9 is the price earnings ratio for the year 1957 or an average of more than one year. However, from the information provided in Exhibit 5, it is clear that 3.9 is the price earnings ratio for the year 1957 alone. In applying this ratio to the R T & E earnings, however, Dr. Nemmers, inexplicably used a three year average of R T & E's earnings and arrived at a value of $68.92. It is noted that on the basis of the fiscal year 1957 only the value on a price earnings basis of R T & E would be $83.65. Dr. Nemmers then weighted the dividend factor three times and earnings once and valued the shares as $51.40 for the most recent years or $47.72 for the three most recent years. He then stated that the highest possible fair market value that could be found was $50.00 per share.

In the main, plaintiff's other expert, Dr. Goodman, a professor at Northwestern University in the Graduate School of Business, considered the same "qualitative" factors as Dr. Nemmers had and drew therefrom similar conclusions. Thus, he also cited the "thinness of management",[6] the voting trust, the fact of default in the loan agreement and the failure to maintain a ratio of two to one as required by R T & E's loan agreement.

He, too, employed the method of comparative appraisal to arrive at a value and also chose Moloney Electric as the only comparable company. However, his method of computation deviated from Dr. Nemmers in that on a dividend basis, he took into consideration the $2.00 extra dividend and placed a value on the stock on a dividend basis midway between $40.00 and $80.00 and chose a value of

---

5. The Dow-Jones Report of Stock Market averages shows that the market had delined to 419 in the last half of 1957 and had gone up to 460–465 range by May of 1958.

6. Factual information was supplied to him by Dr. Nemmers.

$60.00. On a price earnings basis, he used an average of Moloney's price earnings ratio over a four and five year period which came to between 4 and 5. Applying this ratio to a three year average of R T & E's earnings, resulted in a value of between $74.00 to $88.00.

On a dividend basis he then took the figure 80 as being "somewhere" in the middle, towit, $60.00, weighted dividends twice (rather than three times) and earnings once and came out with a figure of $71.00. He then considered those "qualitative factors" heretofore referred to and decided that R T & E was no more than an average company and that the value per share of a block of 400 shares of stock in two blocks of 200 shares apiece on May 15, 1958, was between $65.00 and $70.00 per share.

The court is of the opinion that the valuations of the shares of stock by the plaintiff's experts are far too low for the following reasons, (1) refusal to attribute any importance to the very impressive history of growth of R T & E, (2) the failure to consider the actual history of the stock transactions in the year preceding the date of the gift—the preemptive offering of stock in May of 1957 at which time Dr. Nemmers himself had enough confidence in the company, along with the other stockholders, to exercise his preemptive rights at $130.00 per share, and the offer of Loewi & Company, Inc. in March of 1958. In the face of these facts, evaluation based only on a comparison with Moloney Electric Company, strikes the court as highly unrealistic. While the comparative appraisal is a valid approach in cases where no other information as to stock transactions is available its validity is diminished when only one comparative is used since no two companies are exactly alike, and in the instant case there is no showing that Moloney Electric Company matched R T & E in its growth pattern. The Duff, Anderson, Clark Report, supra, did not restrict its comparatives to one company but analyzed and compared some seventeen companies in reaching its market value of $140.00 per share, as of March of 1957.

The Government did not present any valuation expert. It argues, however, that evidence of the preemptive sale of stock in 1957 at $130.00 per share and the Duff, Anderson, Clark Report, supra, establishes that the R T & E common stock had a market value of in the range of $130.00 to $140.00 in March of 1957, approximately twelve months prior to May 15, 1958; that the market value of the common stock was substantially increased by the successful operation of the company in the fiscal year ending March 31, 1958 and that the March 5, 1958 Loewi & Company offer to buy not less than 20,000 nor more than 30,000 shares at $180.00 per share on a pre-split basis justifies the conclusion that the market value of the stock was $190.00 per share on May 15, 1958.

The market value of stock is the price at which a willing seller and a willing buyer, neither being under any compulsion, would agree to trade if they were both aware of the facts. See Couzens v. Commissioner, 11 B.T.A. 1040 (1928). As stated in that case, as to a completed transaction this is a simple statement. It is not so easy, however, to apply objectively to a hypothetical transaction. The events following May 15, 1958 disclose that by the end of October, 1958, the shares in question were selling at a price amounting to $300.00 per share. By hindsight, the figure of $190.00 would seem, if anything, too low, but the parties to a bargain as of May 15, 1958 would not have had this information available to them. The court has sought to place itself in the position of buyer and seller in May of 1958, and with knowledge of all the facts find " * * * what an intelligent and reasonable seller and an intelligent and reasonable buyer would in their fairly mercenary interests have been most likely willingly to agree upon as a price for the property in question." See Couzens v. Commissioner, supra, p. 1162. It is the court's opinion that a willing buyer would have been most impressed with the facts surrounding the preemptive sale of

1957, supra; with the dramatic growth of the company; with the offer of Loewi & Company to buy in March of 1958, at a price amounting to $180.00 per share, supra; and with the stock split of twenty to one recommended by the Board of Directors in March of 1958, which if authorized, would increase the marketability of the shares he contemplated purchasing. On the other hand, he would be concerned that the major R T & E stockholders had not as yet embarked on a marketing program, and there was no positive assurance that such a program would be consummated.

Having considered all of the relevant factors, the court finds that the fair market value of two lots of 200 shares each of the common stock of R T & E Corporation on May 15, 1958 was $160.00 per share. The plaintiff is therefore entitled to a refund of a portion of the gift taxes paid.

This Opinion will stand for findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

Counsel for the plaintiff will prepare an order for judgment in accordance with the foregoing Opinion and submit it to the defendant for approval as to form.